UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

Case No. 8-10-76492-reg

BRIDGET NISIVOCCIA
a/k/a BRIDGET THORNTON,                                    Chapter 7

                              Debtor.
-----------------------------------------------------------------x
DAMON GIGLIO,

                              Plaintiff,

            - against -                                    Adv. Proc. No. 8-10-08760-reg

BRIDGET NISIVOCCIA and
BRIDGET NISIVOCCIA DESIGNS, LLC,

                              Defendants.
-----------------------------------------------------------------x


## <u>DECISION AFTER TRIAL</u>


        In this adversary proceeding, Damon Giglio (the "Plaintiff") seeks a determination that

Bridget Nisivoccia (the "Debtor" or the "Defendant") obtained money from the Plaintiff by false

pretenses, false representations and actual fraud, giving rise to a non-dischargeable debt pursuant

to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). The debt the Plaintiff seeks to have deemed non-

dischargeable is in connection with payments made by the Plaintiff to an interior design

company wholly owned and controlled by the Debtor, for services provided to the Plaintiff. The

Plaintiff had entered into a written design services contract with the company in connection with

the remodeling of his summer home in the Hamptons. The Debtor's company also provided

design services for other properties owned by the Plaintiff. However, no written contract was

executed for work done at these properties. The design services contract required the Plaintiff to

pay a flat fee to the Debtor's company. Any discounts or savings on goods or services negotiated by the Debtor in the course of completing the project were to be passed on to the Plaintiff. According to the Plaintiff's complaint, the Debtor defrauded the Plaintiff of hundreds of thousands of dollars. The Plaintiff alleges that the Debtor, through the use of false invoices, inflated the costs of goods and services, sometimes marking up the actual charges multiple times. The Plaintiff was also billed for goods that were never ordered and in some cases never paid for by the Debtor.

The Plaintiff seeks relief against the Debtor individually in reliance on a State Court decision rendered pre-petition granting the Plaintiff's motion to compel the Debtor to arbitrate the dispute regarding the fees charged by the Debtor's company. The basis for granting the Plaintiff's motion was that the Debtor dominated her company, and used the company to double bill the Plaintiff for goods purchased. The Debtor asserts that notwithstanding the findings of the State Court, her signature on the contract is a forgery and neither she nor her company are bound by its terms. The Debtor argues in the alternative that if the Court finds that the Debtor did in fact sign the contract, the Plaintiff has failed to prove at trial that she should be liable for the acts of her company, and the State Court's decision to grant the motion to compel arbitration cannot be relied upon to satisfy the Plaintiff's burden of proof in the instant case. Additionally, the Debtor argues that if she is bound by the terms of the contract, it was limited in scope and duration, and is not applicable to the other jobs performed by the Debtor's company.

With respect to the design services contract, the Debtor's claim that she was not a signatory to the contract because her signature was forged is foreclosed by the doctrine of *res judicata*, as the State Court has determined that the Debtor could be held personally liable under the contract she signed on behalf of her company. The Debtor could have, but did not, assert as

that the signature on the contract was a forgery as a defense to the motion to compel. This question has been previously resolved in the State Court proceedings and may not be re-litigated in this proceeding.

The Debtor is also barred by collateral estoppel from arguing that she is not personally obligated under the contract. In ordering that the Debtor individually is bound by the arbitration provisions of the contract, the State Court is deemed to have determined that the Debtor was individually liable under the contract. The State Court concluded that it was appropriate to pierce the corporate veil based on findings that the Debtor dominated the company and she used the company to commit a wrong against the Plaintiff. Based on these findings, which were essential to the decision to compel the Debtor to participate in arbitration, the Debtor is collaterally estopped from seeking a different outcome in this Court. Therefore, the Debtor is bound by the contract's terms and representations. The terms clearly imposed upon the Debtor the obligation to charge the Plaintiff the same price her company paid for goods and services, and not to profit from these transactions. Because the Debtor has no defense or plausible explanation for why she overcharged the Plaintiff for goods and items in direct contradiction to the contract terms, these sums are non-dischargeable under § 523(a)(2)(A).

The Debtor argues that she and her company are free to charge a client whatever the market will bear. In the instant case she states that it is the normal practice to charge a client a multiple of the actual cost. To the extent both parties knowingly agree to such an arrangement they should be free to enter into such a transaction. If the Debtor billed the Plaintiff using her company's own invoices, and the Plaintiff received the items on the invoices, this would be consistent with their understanding and the Debtor did not commit fraud. From what is contained in the record, the Court cannot conclude that the Debtor promised to provide the items

at cost from vendors for any jobs unrelated to the single project governed by the written contract. Therefore, the Debtor was free to charge any price she wanted.  However, this does not excuse the Debtor from liability for committing the fraudulent acts that fall within the categories enumerated in § 523(a)(2)(A).  These acts include presenting the Plaintiff with invoices carrying false or inflated charges on letterhead purporting to be from vendors, billing the Plaintiff and receiving payment multiple times for the same item, or charging the Plaintiff for goods that were never ordered, or for which only partial payment was made by BND.  To the extent the Debtor engaged in this conduct with respect to any of the projects, the amounts paid by the Plaintiff are non-dischargeable debts pursuant to § 523(a)(2)(A).

## *PROCEDURAL HISTORY*

On August 20, 2010, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code.  On November 11, 2010, the Plaintiff filed this adversary proceeding against the Debtor originally seeking to have an alleged debt ("Debt") in the amount of  $1,270,000 deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (B).[1]  The Debtor failed to file a timely answer, and at a hearing held on January 3, 2011, the Court noted the Debtor's default, which was entered on the Court docket on February 8, 2011.  On February 10, 2011, the Plaintiff filed a motion for default judgment, and at the hearing held on February 28, 2011, the Court directed the Debtor to file an answer to the complaint on or before March 14, 2011, or the Court would grant the Plaintiff's motion for default judgment.  On March 11, 2011, the Debtor

---

[1] Pursuant to the Joint Pretrial Memorandum filed on January 17, 2012, the Plaintiff reduced the amount he sought to be deemed non-dischargeable to $704,654.00.  Thereafter, the Plaintiff filed a post-trial brief reducing the amount of the non-dischargeable debt to $669,664.75.  For the reasons set forth in this Memorandum Decision, the Court shall determine whether the Debtor's owes a debt to the Plaintiff that is non-dischargeable, but the dollar amount of the non-dischargeable debt shall be determined in the claims objection process, or in another forum.

filed an answer to the complaint, asserting general denials of the allegations contained in the complaint.  On July 20, 2011, the Plaintiff filed a motion *in limine* ("Motion *in Limine*") to prohibit, restrain and/or enjoin the Debtor from testifying at trial as to any matters she had asserted her Fifth Amendment privilege against self-incrimination at a deposition previously taken by the Plaintiff, and permitting the Court to draw an adverse interest against the Debtor based on the assertion of her Fifth Amendment privilege.  On August 15, 2011, the Debtor filed opposition to the Motion *in Limine* and a cross-motion ("Cross-Motion") to stay the adversary proceeding or extend time to conduct discovery until a criminal investigation commenced by the New York County District Attorney's office against the Debtor regarding allegations of tax evasion was concluded.   On August 18, 2011, the Plaintiff filed a reply and opposition to the Cross-Motion.  On January 17, 2012, the parties filed a joint pretrial memorandum in anticipation of trial.  At a hearing held on January 25, 2012, the Court granted the Cross-Motion in part to extend discovery for the purposes of permitting the Plaintiff to examine the Debtor, who was no longer under investigation by the New York County District Attorney.  1/25/12 Tr., p. 57.  As a result, the Motion *in Limine* was marked off as moot.  A trial on the adversary proceeding was held on January 25, 2012, June 23, 2012 and June 14, 2012.  The Court denied the Debtor's oral motion to dismiss the complaint on June 14, 2012.  On January 3, 2013, the Plaintiff filed a post-trial brief and on January 7, 2013, the Debtor filed a post-trial brief.  On January 10, 2013, the Plaintiff filed a reply brief and on January 14, 2013, the Debtor filed a reply brief.  Thereafter the matter was marked submitted.

### *FACTS*

The Plaintiff is a successful entrepreneur who made his fortune as a founder of a start- up internet company.  The Debtor is an interior designer who operated through BND, which was

wholly owned by the Debtor.   The Plaintiff and the Debtor met through friends of the Plaintiff,

who were relatives of the Debtor, in the latter part of 2006.  After meeting, the Plaintiff hired

BND to provide interior design services for his apartment located at the United Nations Plaza

("New York Apartment").   There was no written contract between the Plaintiff and BND, but the

Plaintiff asserts that he paid BND a flat fee of $8,000 for the services provided at the New York

Apartment.  1/25/12 Tr., p. 48.  The Debtor also testified that BND was paid $8,000 for the

services provided at the New York Apartment, but BND was also entitled to charge a mark-up

for any materials purchased by BND for the New York Apartment.  6/14/12 Tr., p. 9.  The

Debtor was satisfied with the services provided by BND, and he retained BND to assist in the

renovation of one of his two properties located in the Hamptons, New York.   Both the Debtor

and the Plaintiff acknowledge that they embarked on an intimate relationship at or about the

same time the Plaintiff agreed to retain BND for this new project.

BND and the Plaintiff entered into a written contract ("Contract") dated January 18, 2007

for design services.  The Defendant signed the Contract on behalf of BND.  Pursuant to the

Contract, BND was to provide design services in connection with the remodeling, construction

and furnishing of the Plaintiff's property ("Property") located in Southampton, New York (the

"Project").  The Contract sets forth a description of  services BND was to provide, including

assistance with the Plaintiff's purchase of furniture, window treatments, carpeting, equipment,

lighting, building materials, and supervising the contractor selected by the Plaintiff to refurbish

the pool and decking at the Property.  BND was to assist the Plaintiff with shopping for the

furniture and other items, and to "remit or provide [Plaintiff] with all discounts available from

vendors to licensed decorators with respect to items purchased by [Plaintiff]."  Plaintiff's Ex. 1.

All "furniture, furnishings, window coverings and treatments, rugs, carpeting, wall-coverings

and treatments" were to be ordered through BND.  Plaintiff's Ex. 1.   The fee for BND's design services contemplated in the Contract is $20,000.00.  The Contract provides that the services to be rendered by BND will commence on January 18, 2007 and shall terminate upon the substantial completion of the construction project, which was estimated to be April 15, 2007. The Contract provides that "BND shall not be held strictly to the projected time schedule in the event that conditions so present themselves that would make adhering to the projected time schedule either dangerous or impossible."  Plaintiff's Ex. 1. The Plaintiff was to order all furniture, furnishings, window coverings, treatments, carpeting, and wall coverings through BND.  Plaintiff's Ex. 1.  The Contract contains a broad arbitration clause, which states that "[a]ny controversy or claim arising out of or otherwise relating to this contract, or the breach thereof, shall be settled by arbitration in Nassau or Suffolk Counties, New York, in accordance with the rules of the American Arbitration Association."  Plaintiff's Ex. 1.  The Plaintiff paid BND $20,000 for its design services by check dated January 18, 2007, which is the same date the Contract was signed.  Plaintiff's Exs. 1, 8.

As is common with many construction projects, the original scope of the Project spiraled well beyond the initial parameters, and significant changes were added, such as the installation of a new pool, the removal of walls and the entire renovation of the basement.  There were so many delays with the Project that the duration of the Project extended from the projected three months to approximately two years.  The original general contractor was fired in the late Fall of 2007, and the parties had several disagreements over the Project, including whether the Plaintiff had been over-billed for the services rendered by BND. 10/18/12 Tr., p. 43.  Sometime in May or June, 2008, the romantic relationship between the Plaintiff and the Debtor had cooled

considerably, and the Debtor claims that by the Fall of 2008, the Plaintiff had become hostile towards her.  10/18/12 Tr., p. 58.

The parties could not resolve their disputes, and prepetition, the Plaintiff commenced a proceeding in State Court ("State Court Action") to compel the Debtor and BND to proceed to arbitration pursuant to the Contract.  The Debtor opposed the motion to compel arbitration on the basis that she did not sign the Contract on her own behalf, but on behalf of BND.  Therefore, she was not bound individually by its terms and could not be compelled to participate in an arbitration. The State Court was called on to determine three threshold questions that were raised in the motion to compel arbitration:  (1) whether the parties made a valid agreement to arbitrate and/or were bound to arbitrate, (2) if so, whether the terms of the contract mandating arbitration were complied with; and (3) whether the claim sought to be arbitrated was time barred. The State Court entered a decision ("State Court Decision") dated October 13, 2009, granting the Plaintiff's motion to compel the Debtor and BND to proceed to arbitration.  Plaintiff's Ex. 5. In the State Court Decision, the State Court made the following findings:

1.  While the Debtor did sign the Contract, she did not sign it in her personal capacity.

2.  Because she did not sign the Contract in her personal capacity, but on behalf of BND, the Debtor could only be compelled to proceed to if it was appropriate to "pierce" the LLC veil of BND to impose personal liability upon the Debtor. State Court Decision, p. 3.

3.  In order to successfully pierce the corporate veil, the Plaintiff had the burden to "show that [the Debtor] exercised complete domination over BND with respect to the specific transaction in issue and that such domination was used to commit a fraud or wrong against the [Plaintiff] which resulted in his injury."  State Court Decision, p. 3, 4 (citing *Matter of Guptill Holding Corp. v. State of New York*, 307 N.Y.S.2d 970 (1970), aff'd.,

31 N.Y.2d 897 (1972); *N.L.R.B. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052-1053

(10th Cir. 1993) (other citations omitted)).

4. The Plaintiff made a *prima facie* showing that piercing the corporate veil was

appropriate, based on the Debtor's exercise of complete domination over BND with

respect to the transaction with the Plaintiff, and the Debtor's deposit of funds for BND

into her bank account, along with double billing of the Plaintiff for goods selected by

BND.

5. The Debtor failed to raise any factual issue in her answer in response to the *prima facie*

showing by the Plaintiff that the corporate veil should be pierced.  State Court Decision,

p. 6.

The Debtor's Chapter 7 petition stayed the arbitration proceeding, and on November 11, 2010,

the Plaintiff filed this adversary proceeding.

At trial, the Plaintiff testified regarding BND's services provided in connection with the

Project, and the renovation of the New York Apartment, his apartment in Miami, Florida, as well

as certain work performed at another home in the Hamptons ("Blackwatch").  The Plaintiff

testified that the Debtor agreed to a fee of $20,000 for the services to be rendered by BND with

respect to the Project, which amount was reflected in the Contract.  6/12/12 Tr., p. 6.  The

services BND provided at the three properties unrelated to the Project were not governed by a

written contract.  The Plaintiff testified that with respect to the Project, BND would place all

orders for materials, supplies, furniture and fixtures, and any discount offered to BND would be

passed on to the Plaintiff, which arrangement was reflected in the terms of the Contract.  6/12/12

Tr., p. 8.   The practice between the parties was for the Plaintiff to place the order with BND and

BND to place the order with the vendor.  BND would receive any discounts to which a designer

was entitled, and the discount would be reflected in the amount charged to the Plaintiff.  The Plaintiff would pay BND, and BND would forward the payment to the vendor.  6/12/12 Tr., p. 8.

According to the Plaintiff's testimony, he first questioned BND's billing terms when a drapery supplier refused to deliver items he had ordered through BND, and for which he had already paid BND.  The Plaintiff called the drapery company, and was advised by the drapery company that the bill had not been paid.  6/12/12 Tr., p. 9.  The Plaintiff paid the drapery company directly, and received a receipt for payment.  According to the Plaintiff, the receipt he obtained from the drapery company was "completely different" from the invoice BND had provided the Plaintiff.  6/12/12 Tr., p. 9.  Upon questioning by the Plaintiff, the Defendant confirmed by e-mail that the Plaintiff was only to be charged the same amount BND was charged for supplies and merchandise. Plaintiff's Ex. 3.  The Defendant stated in response to another e-mail from the Plaintiff on June 6, 2008, that BND's billing employee always sent invoices directly from the supplier to the Plaintiff to confirm that BND was not charging a mark-up on merchandise and materials purchased.  (Plaintiff's Ex. 4).  In support of his allegations that the Debtor was charging additional amounts for supplies and merchandise purchased for the Project, the Plaintiff introduced a series of invoices, including two invoices from Stark Carpet Co. reflecting identical dates and order descriptions for carpeting purchased for the Project. Plaintiff's Exs. 27 and 28.  The invoice produced from Stark Carpet Co. reflects carpeting purchased in the amount of $9,927.00 (Plaintiff's Ex. 27), and the invoice BND forwarded to the Plaintiff reflects the same carpeting, but with a purchase price in the amount of $16,210.74. Plaintiff's Ex. 28.   The $16,210.74 charge is supported by the invoice the Debtor remitted to the Plaintiff from BND, dated August 14, 2008.  Plaintiff's Ex. 53.

With respect to items purchased for the New York Apartment, the Plaintiff produced two invoices from Schwartz Design Showroom dated April 18, 2007, which list the same merchandise purchased.  Plaintiff's Ex. 35 and 36.  The total for Ex. 35 is $23,760.38.  The total for Ex. 36 is $36,392.21. According to the Plaintiff, he received Ex. 36 from BND, and Ex. 35 directly from Schwartz Design Showroom.  6/12/12 Tr., p. 17.  The Plaintiff also identified an invoice he obtained from Stark Carpet Co. regarding a rug purchased in the amount of $4,293.82 for the New York Apartment, for which BND had billed the Plaintiff $9,291.88.  Plaintiff's Exs. 29 and 30; 6/12/12 Tr., p. 14, 15.   According to the Plaintiff, he obtained the invoices reflecting the actual amounts charged by the vendors directly from the vendors upon his request.  6/12/14 Tr., p. 14.   The Plaintiff also produced an invoice for a coffee table from Kreiss for the New York Apartment in the amount of $2,610.00 (Plaintiff's Ex. 37), and an invoice from BND in the amount of $4,952.10 for the identical coffee table.  Plaintiff's Ex. 38.

The Plaintiff introduced a witness and other documents supporting his allegations.  At trial, Mr. Israeli, the owner of Short Hills Marble and Tile, testified that in 2007 and 2008, his company delivered marble and tile on behalf of orders placed by the Debtor.  1/25/2012 Tr., p. 9. Mr. Israeli also testified that the records of Short Hills Marble and Tile contained copies of invoices reflecting the sale of tiles for the Project, along with payment and shipping of tiles listed in the invoices.  1/25/12 Tr., p. 10 – 19, Plaintiff's Exs 9, 11, 13, 15, 17, 19, 21 and 23. According to Mr. Israeli, a series of invoices made to look like the above invoices were prepared by another entity, which reflect charges far in excess of what Short Hills Marble and Tile charged and received for the products in question.  1/25/12 Tr., p. 15 - 19, Exs. 10, 12, 14, 16, 18, 20, 22 and 24.  For example, Exs 9 and 10 both reflect the same letterhead, the same invoice date, the same invoice number, the same amount of deposit, and the same description of goods.

However, the unit prices in Ex. 9 for the various items are much less than the unit prices quoted in Ex. 10.  The total amount of the invoice in Ex. 9 is $37,807.35, and the total amount of the invoice in Ex. 10 is $121,400.00.  The remaining invoices from Short Hills Marble and Tile's records reflect amounts charged that are roughly half of the amounts listed as being charged pursuant to the marked-up invoices, except for Plaintiff's Ex. 25, which is marked as a "quotation" from Short Hills Marble and Tile dated June 26, 2008 for merchandise in the amount of $151,537.25.  It is not marked as an invoice, there is no corresponding invoice reflecting actual prices charged by Short Hills Marble & Tile, and there is no check in evidence from the Plaintiff corresponding to this invoice at or around this date.

In addition to the testimony and exhibits regarding the tile purchases, the Plaintiff introduced two invoices from Artifacts International both dated April 18, 2007 (Plaintiff's Exs. 39, 40).  One invoice reflects a total of $3,059.00 and the other invoice reflects a total of $8,203.24 for the same merchandise.  There are also two invoices from Niedermaier for a wood and glass console for the Project.  Plaintiff's Exs. 43 and 44.  Exhibit 43 is dated January 21, 2009 and lists a price of $6,550.00 and Ex. 44, dated August 12, 2008 lists a price of $7,961.00.  According to the Plaintiff, BND provided him with Ex. 44, and he obtained Ex. 43 from Niedermaier directly. 6/12/12 Tr., p. 19 – 20.  There are also two sets of invoices for two different lighting pieces purchased, one set  listing a purchase price of $3,990.00 and $$5,334.00 for the same lantern (Plaintiff's Exs. 45 and 46), and one set for  lighting in the amount of $7,504.00 (Plaintiff's Ex. 47), and the same lighting in the amount of $12,120.00.  Plaintiff's Ex. 48.  All of the lighting was purchased for the Project.

The Plaintiff testified that he was charged by BND for many items which he never received.  Plaintiff's Ex. 53.  The missing items included four chandeliers, window shades, and a

coffee table from the invoice bates stamped 116/600, but there is no check corresponding to this invoice, so there is no evidence that this invoice was ever paid by the Plaintiff. Of the remaining documents in Ex. 53, there are no checks from the Plaintiff corresponding to the following invoices issued by BND:

Invoice no. 161, dated February 28, 2007, in the amount of $1,703.44

Invoice no. 222, dated December 31, 2007, in the amount of $7,787.76

Invoice no. 290, dated August 14, 2008, in the amount of $60,214.42

Email from BND to the Plaintiff dated June 6, 2008, re: Window Tech Invoice and an amount due of $19,115.20 (Bates Stamp no. 510-600)

Invoice from Candelino Kitchens, dated August 14, 2007, in the amount of $2,478.06 (Bates Stamp no. 113/600)

The Plaintiff also alleges that BND charged the Plaintiff twice for several items including a sofa for the New York Apartment, and countertops for the Blackwatch kitchen. Plaintiff's Exs. 56 and 57. However, the Plaintiff did not produce checks corresponding to both invoices to demonstrate that he paid twice for these items. With respect to the allegation that the Plaintiff was charged twice for sales tax in the amount of $8,389.50 (Plaintiff's Ex. 59), the checks introduced by the Plaintiff only support a finding that he paid for this charge once. Plaintiff's Ex. 8. The same is true for the sales tax in the amount of $8,960. Plaintiff's Ex. 60.

Aside for the $8,000.00 paid by the Plaintiff to the Debtor for the design services rendered for the New York Apartment, the Plaintiff testified that the Debtor was paid for the work performed at the other locations, including the Plaintiff's father's residence, using a "bartering" system. 6/14/12 Tr., p. 36. According to the Plaintiff, the Debtor was allowed to use the Plaintiff's Manhattan office, and was permitted to stay at Blackwatch with her daughter in

lieu of compensation for the work performed at these other locations.  The Plaintiff also designed the website for BND.  10/18/12 Tr,, p. 55.   The Plaintiff claims that there never was an arrangement to pay the Debtor by allowing her to charge a mark-up for each item purchased for any of the locations.

At trial, the Debtor denied ever signing the Contract, and claimed that although the signature on the Contract looked like hers, it was a forgery.  10/18/12 Tr., p. 19, 96.  The Defendant admitted that she previously testified in a deposition that she did sign the Contract. (10/18/12 Tr., p. 110).  However, she claims to have attended the deposition without counsel under false pretenses and therefore her deposition testimony was not admissible as a matter of equity.   (10/18/12 tr., p. 104, 105).  In defense of her billing practices, the Debtor testified as follows:

> You know, back then, standard industry - - which has changed quite a bit . . . .
> You know, in artwork, it could be 1,000, you know, percent markup.  In tile, it
> was usually, you know, fifty-percent markup.  Furnishing, the same thing, fifty-
> percent markup.  You know, it just depended on the product and what the - - you
> know, what the client was willing to pay.  . . .  You know, back then it wasn't so
> methodical.  It was just, you know, what was in the market and what the market
> would bear or the client would bear - - you know, be willing to pay.

10/18/12 Tr., p. 32, 35.  The Debtor also testified that prior to May, 2008, BND never forwarded vendor – generated invoices to the Plaintiff.  10/18/12 Tr., p. 60.  The Debtor alleges that BND billed the Plaintiff for materials on its own letterhead, or by e-mail.  10/18/12 Tr., p. 125. According to the Debtor, she only provided vendor invoices to match the marked-up amount BND previously charged the Plaintiff because the Plaintiff requested the invoices.   According to the Debtor, the Plaintiff requested these vendor invoices because the Plaintiff was contemplating commencing a lawsuit against the original general contractor on the Project, and because the

Plaintiff was considering selling the Property and wanted to provide support for the actual costs of renovating and furnishing the Property. 10/18/12 Tr., p. 60, 61. The Debtor testified that it was standard practice for designer showrooms to create two invoices – one reflecting the actual cost paid for goods, and one reflecting the amount the designer charged the client for the goods. 10/18/12 Tr., p. 63, 64.

The Debtor did not introduce into evidence any documents or testimony from vendors to corroborate her claim that it was customary for designer showrooms to create two invoices reflecting the actual costs for the goods and the marked-up amounts charged by the designer. Regardless of why the two sets of invoices were created, it is undisputed that the Debtor was charged one price for much of the materials and many furnishings for the Project, and billed the Plaintiff at a rate that was often more than double the actual price. It is also undisputed that the Contract specifies that BND was to provide the Plaintiff with any discounts that BND received from vendors as a licensed decorator, and that the Contract provides a flat fee of $20,000.00 for BND's design services in connection with the Property. Plaintiff's Ex. 1, p. 5, 6.

### *JURISDICTION*

A proceeding to determine dischargeability under section 523(a)(2) of the Bankruptcy Code is a core proceeding over which this Court has jurisdiction. *See* 11 U.S.C. §§ 157 and 1334. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law to the extent required by Bankruptcy Rule 7052.

### *DISCUSSION*

As a threshold matter, the Court must determine the effect the Decision in the State Court Action has in this adversary proceeding. There are many findings contained in the State Court

Decision, and the State Court Decision is a final order from which the Debtor did not take an appeal. However, the parties dispute the extent to which these findings have a preclusive effect on certain issues raised in this adversary proceeding.

## I. Preclusion

The Plaintiff asserts that under the theories of *res judicata* and/or collateral estoppel, the findings in the Decision preclude the Debtor from alleging that the Debtor's signature on the Contract was a forgery, and from contesting that the Debtor was a party to the Contract under the theory of piercing the corporate veil.  In contrast, the Debtor seeks to treat the decision in the State Court Action as having no preclusive effect with respect to either of these issues. Therefore, the Debtor is free to argue that her signature on the Contract was forged, and that BND never agreed to accept only $20,000 for the services provided to the Plaintiff in connection with the Project.  The Debtor also asserts that even if the signature on the Contract was determined to be the Debtor's, the Plaintiff was required to establish at trial that the corporate veil of BND should be pierced to bind the Debtor under the Contract, or to hold the Debtor liable for the acts of BND as its alter ego. Because the Plaintiff did not meet his evidentiary burden, the Debtor alleges that the complaint must be dismissed.

### A. Res Judicata

The doctrine of *res judicata*, also known as "claim preclusion," is grounded in the Full Faith and Credit Clause of the United States Constitution.  U.S. Const. art. IV, § 1.  Under this doctrine, "'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *Swiatkowski v. Citibank*, 745 F. Supp.2d 150, 171 (E.D.N.Y. 2010) (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470,

476 (1998) (other citations omitted)).  A state court decision has the same preclusive effect whether it is used in a subsequent state court proceeding or federal court proceeding. *Swiatkowski v. Citibank*, 745 F. Supp.2d at 171 (citing *Burka v. N.Y. City Transit Auth.,* 32 F.3d 654, 657 (2d Cir. 1994)).  The Court of Appeals for the Second Circuit has consistently recognized that *res judicata* applies to prevent "'a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided.'" W*oods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992), *cert. denied*, 489 U.S. 1007 (1988) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir. 1992) and *Greenberg v. Board of Governors of Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992) (other citations omitted)).   *Res judicata* applies to judgments that were obtained by default, *see Kelleran v. Andrijevic*, 825 F.2d 692, 694-95 (2d Cir. 1987), but it may not apply if the judgment was obtained by extrinsic fraud or collusion.  *In re Ward*, 423 B.R. 22, 29 (Bankr. E.D.N.Y. 2010).

Where a final judgment on the merits is rendered, *res judicata* prevents a party from asserting claims that were or could have been litigated in a prior action based on the same relevant facts.  *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192-93 (N.Y. 1981), *rearg. denied*, 55 N.Y.2d 878 (N.Y. 1982).  The party asserting claim preclusion must establish "(1) the previous action involved an adjudication on the merits, (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *Neshewat v. Salem*, 365 F. Supp.2d 508, 516 (S.D.N.Y. 2005) (citing *Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir. 2000)).

Applying these principals, *res judicata* applies to bar the Debtor from asserting the defense in this proceeding that her signature on the Contract was a forgery. The State Court Decision resolved the following three threshold issues in order to determine whether to grant the Plaintiff's motion to compel the Debtor and BND to arbitrate their disputes:  1) whether the parties made a valid agreement to arbitrate and/or were bound to arbitrate, 2) if so, whether the terms of the agreement mandating arbitration were complied with; and 3) whether the claim sought to be arbitrated was time-barred if it was asserted in the State Court.  *See* N.Y. C.P.L.R. §§ 7502(b) and 7503. (McKinney 2013).

Because the Debtor asserted the defense that she signed the Contract solely as a representative of BND and not in her individual capacity, the issue of whether the Debtor's signature could bind the Debtor to an arbitration provision in the Contract was squarely before the State Court.  The State Court concluded that the Debtor's signature did bind the Debtor to the Contract's arbitration provision, and necessarily determined that the signature was the Debtor's. The State Court did not exceed its authority to make this determination, which is binding on the Debtor.  *See Kennelly v. Mobius Realty Holdings LLC*, 822 N.Y.S.2d 264, 267 (1st Dept 2006) (*citing M.I.F. Sec. Co. v. R.C. Stamm & Co.*, 463 N.Y.S.2d 771 (1983), *aff'd in part*, 60 N.Y.2d 436 (1983) ("[I]t is a judicial responsibility, and not the arbitrator's, to decide the threshold question of whether the parties are bound by a valid agreement to arbitrate"). The Debtor asserts, and the Court agrees, that the State Court's reach is limited when ruling on a motion to compel arbitration.  It is also true that under New York law and federal law, courts are required to treat an agreement containing an arbitration clause as if there were two separate agreements, a substantive agreement between the parties and an agreement to arbitrate, and the courts are not to rule on the substance of the agreement.  *Amoroso v. Metropolitan Life Ins. Co.*, 862 N.Y.S.2d

812, (Sup. Ct. 2008) (citing *O'Neill v. Krebs Communications Corp.*, 790 N.Y.S.2d 451, 452 (2nd Dep't 2005) (other citations omitted)).   The State Court was charged with determining whether the provision in the Contract regarding the agreement to arbitrate was valid.  In order to make this determination, there must have been consent to arbitrate.  The State Court could only conclude this if the signatures on the Contract were authentic.  It was clearly within the State Court's province to make this determination.

An example of the state court's authority to rule on the issue of forgery on a motion to compel arbitration is found in *Kennelly v. Mobius Realty Holdings LLC*, 822 N.Y.S.2d at 264.  In *Kennelly,* the Supreme Court, Appellate Division reversed the lower court's decision to compel arbitration where the petitioner sought to stay arbitration on the grounds that his signature on the contract was a forgery.  The state court concluded that the issue of whether the signature was genuine, along with the issue of whether the agreement was "permeated with fraud, such that the arbitration clause would fall with the rest of the agreement" was an issue for the court to decide. 822 N.Y.S.2d at 267.  Similarly, in *O'Neill v. Krebs Communications Corp.*, the court's decision to deny a petition to stay arbitration and to grant a cross-motion to compel arbitration was upheld despite the fact that the party seeking to stay arbitration alleged that the entire agreement was void because it was altered after he signed it.  According to the appellate court, because the party acknowledged that he did sign an agreement containing an arbitration clause, the court's decision to compel arbitration was correct even if, at arbitration, the agreement was subsequently deemed void because of the alterations made after it was signed.   790 N.Y.S.2d  at 452.

In the Debtor's proceeding, in order to defeat the motion to compel arbitration, the Debtor could have raised the defense that her signature on the Contract was a forgery but did not do so. Instead, the Debtor asserted that she signed the Contract on behalf of BND, and was not

personally liable to the Plaintiff under the Contract. Accordingly, the State Court's conclusion that the signature on the Contract bound the Debtor to proceed to arbitration is *res judicata* as to the genuineness of the Debtor's signature.

### *B. Collateral Estoppel*

Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 185 (2d Cir. 2011) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). Under New York's preclusion law, which must be applied, collateral estoppel prevents parties from relitigating an issue when "(1) the identical issue necessarily was decided in the prior action and is decisive in the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) (citations omitted), *cert. denied*, 555 U.S. 1097, 129 S. Ct. 895, 173 L.Ed.2d 106 (2009); *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006).

In this case, the Plaintiff relies on the findings in the State Court Decision that BND and the Debtor are one and the same in order to impose liability against the Debtor under the Contract, but does not rely on any findings by Justice Sgroi in order to make out the elements of Section 523(a). In the State Court Decision, Justice Sgroi found as a matter of law that BND and the Debtor were one and the same under a veil piercing analysis. It was necessary for Justice Sgroi to make this finding in order to conclude that the Debtor was a party to the Contract. The State Court determined that the following elements had been proven: 1) domination and control of BND by the Debtor, 2) damages caused by the Debtor's acts, and 3) abuse of the privilege of doing business in the corporate form. State Court Decision at 6 (citing N.Y.C.P.L.R. § 3013). In

making this determination, the State Court undertook a thorough analysis of corporate veil-piercing to bind the principal of BND to the contract, despite the fact that the principal is not a signatory. Justice Sgroi recognized that absent a showing of an abuse of the corporate form, a non-signatory could not be compelled to arbitrate pursuant to an arbitration clause. Justice Sgroi found that the Plaintiff made a "prima facie showing" under the "more stringent pleading requirements interposed by the CPLR" that the corporate protections provided to the principal should be disregarded. State Court Decision at 6. The Debtor's answer in the State Court Action failed to raise any issue of fact in response to the Plaintiff's allegations that the Debtor deposited the Plaintiff's checks payable to BND into her own personal account, and that BND double billed the Plaintiff the sum of $46,604.92. *Id.*

There is no doubt that determining whether to pierce the corporate veil of BND was a central, necessary component to the State Court Decision. It is equally clear that the Debtor had a full and fair opportunity to litigate this issue in the State Court Action. The Debtor was served with the motion in State Court and filed an answer. The Second Circuit has held in the context of a nondischargeablility action under section 523(a) of the Bankruptcy Code that a party has received a "full and fair opportunity" to litigate where the party is properly served and afforded an opportunity to contest the allegations, whether the party responds or not. *Evans v. Ottimo*, 469 F.3d at 282. Therefore, collateral estoppel bars the Debtor from relitigating whether the corporate veil of BND should be pierced to deem the Debtor a signatory and obligor under the Contract, and whether the Debtor and BND are one and the same with respect to the design services provided by BND at the four other locations. However, this only serves to establish that the Debtor agreed to accept $20,000 for the design services rendered for the Project, and she was to provide the Plaintiff with all discounts obtained by BND with respect to items purchased for

the Project.  Because the services provided by BND/the Debtor at the New York City Apartment, the Miami apartment, Blackwatch and the Plaintiff's father's residence were not incorporated into the Contract, the Contract terms do not apply to services performed at these other locations.

## II.  Section 523(a)(2)

The Plaintiff asserts that the Debt accrued as a consequence of the Debtor's obtaining of monies through improper, deceitful, and unlawful conduct through the course of the Debtor's business dealings with the Plaintiff.  As such, Plaintiff seeks to have the Debt excepted from discharge pursuant to Bankruptcy Code § 523(a)(2) of the Bankruptcy Code which provides, in relevant part, as follows:

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt--
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>>> (B) use of a statement in writing--
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2) (2012).  The plaintiff has the burden of demonstrating nondischargeability under this section by a preponderance of the evidence. *Sandak v. Dobrayel* (*In re Dobrayel*), 287 B.R. 3, 12 (Bankr.S.D.N.Y. 2002); *Farraj v. Soliz* (*In re Soliz*), 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996).

Sections 523(a)(2)(A) and (a)(2)(B) are mutually exclusive, as the latter section requires a written financial statement, while the former section excludes such a device from its application.  In order for section 523(a)(2) to apply under either scenario, the debt at issue must represent "money, property, services, or an extension, renewal, or refinancing of credit" within

the meaning of the Bankruptcy Code.  In a case such as the one at bar, a plaintiff simply must show that the defendant "obtained money or property" as a threshold matter.  *Voyatzoglou and TE 2000 v. Hambley* (*In re Hambley*), 329 B.R. 382, 397 (Bankr..E.D.N.Y. 2005).  Here, the Debtor obtained money from the Plaintiff as compensation for services performed in connection with the Project and with respect services provided at the other four properties.  The Plaintiff has established a "debt" for purposes of section 523(a)(2).

### A. Section 523(a)(2)(B)

A particular debt may be nondischargeable based upon a writing by the Debtor "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B). To prevail before the Court, the Plaintiff must prove each element of this section by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-86 (1991).

Because none of the writings exchanged between the Plaintiff and Debtor – the Contract, the Invoices, or Communications – constitute statements regarding the Debtor's "financial condition," § 523(a)(2)(B) does not apply to this case.  There is simply no information contained in the writings exchanged between the Debtor and the Plaintiff that had anything to do with the Debtor's financial condition for purposes of finding any part of the debt nondischargeable under § 523(a)(2)(B).  Therefore, the Plaintiff's First Cause of Action is dismissed for failure to establish a *prima facie* case.

### B. Section 523(a)(2)(A)

Section 523(a)(2)(A) deems nondischargeable any debt arising from the Debtor's "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  Critical components in this analysis require findings regarding the Debtor's intent, and the Plaintiff's reliance on the Debtor's statements or conduct. According to the Plaintiff, the Debtor engaged in the following five fraudulent or deceptive devices in order to defraud the Plaintiff:

(i)       Invoice Markups – The difference between invoices from the seller and duplicate invoices with increased prices.

(ii)      Bogus Invoices – Invoices which were paid, for which the items or furnishings were non-existent.

(iii)     Undelivered Goods – Legitimate invoices for goods which were paid for and never delivered

(iv)      Duplicate Invoices – Invoices for items which were previously paid for by the Plaintiff

(v)       Direct Payments - Payments to vendors for items which the Plaintiff had already paid to the Debtor, but the Debtor failed to pay to the vendors.

### *(1) False Pretenses*

For purposes of section 523(a)(2)(A), the term "false pretenses" means "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000).  It includes any "scam, scheme, subterfuge, artifice, deceit, or chicanery in the accomplishment of an unlawful objective" by the defendant.  *Id,*   "A false pretense has also been held to be an implied misrepresentation or conduct intended to create a false impression," although in either case, it is

"promoted willingly and knowingly by a defendant and is not the result of unintentional conduct or an unintentional misrepresentation." *In re Hambley*,329 B.R. at 396.  False pretenses can exist where a party fails to disclose material facts upon which a transaction depends.  *Id.* (citing *In re Soliz*, 201 B.R.at 369).

In order to establish a debt is nondischargeable as a debt for money obtained by false pretenses, the plaintiffs must establish "(1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property or credit to the defendant." *In re Hambley*, 329 B.R. at 396 (citing *In re Dobrayel*, 287 B.R. at 12).

In this adversary proceeding, the Debtor made an implied representation on each invoice she forwarded from a third party to the Plaintiff that the amount listed on the invoice was equal to the amount she was charged for the goods.  The Debtor did not disclose the discrepancy between the amount charged by the third party and the amount the Debtor charged the Plaintiff. In fact, she acknowledged in e-mail correspondence that the parties had an arrangement to pass on any discounts the Debtor received to the Plaintiff.  The Plaintiff paid the Debtor the face amounts of the invoices based on his belief that the amounts of the invoices reflected the amounts charged by the vendors listed on each of the invoices.  The Debtor's excuse that it was common in the industry to receive two invoices from vendors, with one set matching the actual price charged to the designer, and one price charged by the designed to the client, was not supported by any documentary evidence or testimony.  The only evidence regarding this issue corroborates the Plaintiff's allegations.  The Short Hills Marble and Tile vendor testified that his

company was not in the practice of issuing two sets of invoices for the purposes outlined by the Debtor.

Based on the record before the Court, the Plaintiff has established by a preponderance of the evidence that with respect to the Project, any portion of the funds received by the Debtor from the Plaintiff for goods which were in excess of the actual amount charged by the vendor are non-dischargeable under § 523(a)(2)A.  To the extent the Debtor charged a mark-up for goods unrelated to the Project, and she used BND letterhead, there is no cause of action under § 523(a)(2)(A) because the Debtor was not making any representation regarding the price BND was charged for the goods.  However, where the Debtor presented invoices to the Plaintiff on letterheads of third parties which reflected a mark-up from the price BND was actually charged, these amounts are non-dischargeable under § 523(a)(2)A.

With respect to invoices for goods the Plaintiff never received on any of the projects, to the extent there are corresponding checks showing the Plaintiff paid the Debtor for these goods, these amounts are non-dischargeable under  § 523(a)(2)(A).  Clearly, presenting an invoice seeking payment for goods which are never delivered constitutes false pretenses, which applies to each project.

### (2) False Representation

A "false representation" under section 523(a)(2)(A) means that "(1) the defendant made a false or misleading statement (2) with intent to deceive (3) in order for the plaintiff to turn over money or property to the defendant." *Frishberg v. Janac (In re Janac)*, 407 B.R. 540, 552 (Bankr. S.D.N.Y. 2009); see also *In re Dobrayel*, 287 B.R. at 12 (citing BLACK'S LAW DICTIONARY at 619 (7th ed.1999)).  In general, a failure to disclose information may constitute false pretenses within the meaning of Code Section 523(a)(2)(A).  In re Hambley, 329

B.R. at 396.  The critical element of intent admittedly presents some difficulty as direct evidence is rarely readily available.  *See Citibank (South Dakota, N.A. v. Senty* (*In re Senty*), 42 B.R. 456, 459 (Bankr.S.D.N.Y. 1984).  Nevertheless, "intent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the [creditor]."  *Hong Kong Deposit and Guaranty Co., Ltd. v. Shaheen  (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y.1990) (citations omitted); see also *In re Hambley*, 329 B.R. at 396-97 ("it is well established that intent to deceive may be established through circumstantial evidence and inferred from the totality of the evidence presented").

In this case, every invoice the Plaintiff paid to the Debtor for goods which were never delivered, and every invoice the Plaintiff paid to the Debtor which was a duplicate invoice for which the Debtor already received payment, constitutes deceptive conduct by the Debtor, for the purposes of cheating the Plaintiff out of additional funds.  The submission of a duplicate invoice is a false representation that such amounts are due and outstanding and to the extent the Plaintiff made payment twice for the same goods, the Plaintiff was cheated out of moneys, which debt is non-dischargeable under § 523(a)(2)(A).  The same is true for payments made for goods that were never delivered, or for payments made for bogus or completely false invoices.

### (3) Actual Fraud

Finally, a debt may be excepted from discharge under section 523(a)(2)(A) where a plaintiff can establish the elements of "actual fraud," which include "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of  the damages."  *Nunnery v. Rountree (In re Rountree)*, 340 Fed. Appx. 899, 901 (4th Cir. 2009) (citing *Field v. Mans*, 516 U.S. 59, 61 (1995)).  Under

Second Circuit case authority, the elements of actual fraud are "a false representation, scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006).

In this case, each time the Plaintiff paid the Debtor for goods that were never received, or paid duplicate invoices, the payments resulted in a non-dischargeable obligation under § 523(a)(2)(A). By submitting invoices for goods which the Debtor either did not order or failed to pay the vendor, the Debtor was falsely representing that upon payment of the invoices, the Plaintiff would receive the goods. Reliance on the invoices was justifiable based on the parties' course of conduct and business relationship. To the extent that the Plaintiff already paid for goods and had to pay additional funds because the Debtor never paid the vendors for the items in full, these amounts are non-dischargeable as well, so long as the Plaintiff has evidence supporting the previous payment for these items. The additional payments to the vendors directly are in the nature of a double payment by the Plaintiff.

## CONCLUSION

For the foregoing reasons, this Court dismisses the First Cause of Action and finds in favor of the Plaintiff on the Second Cause of Action. The Plaintiff's claim is to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). The actual dollar amount of the claim shall be determined in connection with the claim adjudication process or in another forum.

Dated: Central Islip, New York
      December  10, 2013          ***/s/ Robert E. Grossman***
                               Robert E. Grossman
                               United States Bankruptcy Judge